This morning is T-Mobile versus Loudoun County Board of Supervisors. Whenever you can get ready, Mr. Stoner, we'll hear from you. Good morning, your honors. My name is David Stoner. I'm here today representing the Loudoun County Board of Supervisors. As the court knows, this case is essentially two cases in one involving the separate denials of two separate cell towers. It's two cases, but I can't figure out why it's so many counts. It looks to me like each count is just a different reason for either allowing a tower or not allowing it. And it actually makes it a little more complex to break it up that way, because some of the reasons may be sufficient, some may not be. But I understand the structure now, and I don't think counts will help by breaking it all up into counts like that. It seems to me it's really the bell tower and the silo. I quite agree, your honor, and we certainly think that counts three and five, which purport to be separate claims of violations of the act based on RF emissions considerations, don't belong as separate counts. They should be subsumed under a substantial evidence test. I'd like to begin with addressing T-Mobile's lack of standing with respect to the bell tower site. It's a very simple issue. T-Mobile claims a property right to place the 80 foot bell tower in the island, 180 feet away from the equipment compound in the southwest corner of the property. It claims that right based on its lease option with the church. But in fact, that lease option, as we've pointed out in the briefs, does not provide for a bell tower facility anywhere on the property, much less in the island. That agreement sets out what the premises for T-Mobile's facility should be. It clearly describes that in exhibit B as a facility in the southwest corner of the property, a 390 or 440 square foot compound in which there was to be an 80 foot light polar flagpole facility. Well, you know, I don't want to cut this off too much, but I think the record demonstrates that you had an arrangement with the church by whatever means that was interfered with and denied the tower. You were denied the expectation of proceeding forward. The church approved the bell tower, they approved the changes that you had, there was a lease. And so I'm not sure there's a serious standing argument here, but you can keep pressing. Well, your honor, I appreciate that. As a representative of the board, I certainly disagree. We think that the church clearly did not approve, did not amend the agreement, did not actually agree to the bell tower. There was an email or a letter or an affidavit from one of the church trustees that said they approved the bell tower location. Why wouldn't that be sufficient? Because the lease option agreement itself provides for how it was to be amended. In writing, signed by both parties. They spent all this money, they did all these designs, all these changes, met all these times with the church, had the support of the church. And the application was denied. Now you're saying they can't challenge that because some formal document wasn't, the I wasn't dotted? Their interest was affected, and their expectation, and their expenditures, and their future interests. They want to put a tower there. And I don't, I don't, I don't even think myself, I don't even think you're close on it. But you can keep pressing it. I don't want to waste the court's time. I don't speak for my colleagues. You know, we vote independently. Certainly, certainly. You can keep pressing if you want. I would just point out. You might want to move on. I fully intend to. I'd like to address next the RF emissions issue. Particularly with regard to the Steven Silo site. And the one count where. What issue did you, which issue? RF emissions? Yes. The one count where Judge Lee granted summary judgment. This is count what? Count five. Okay, thank you. Granted summary judgment to T-Mobile. Clearly, we're dealing with a limited preemption in this act. Congress, while it certainly imposed specific limitations on local government's authority and ability to regulate the siting of cell towers, at the same time said, except to the extent that we're limiting your authority, we are preserving your local zoning authority. Your traditional local zoning authority. On some ways, we're, this seems to be a little reversed here. Because you'd have to, we would have to find that the, there was no sufficient evidence. And that there was, or that there was no sufficient evidence. And that there was no, there was an effective prohibition before we would default to this issue, wouldn't we? I, I think that you wouldn't need to reach it. Unless you, you found, well, in, in fact, let me, let me take a step back. I got it backwards. Well, your honor, this really should be viewed in the context of a substantial evidence analysis, the way the second circuit did in the Oyster Bay case. In determining whether there is substantial evidence to support a denial, a court simply disregards any evidence of consideration of a preempted area. Such as FCC regulated. You have a separate part of the statute that stands alone from the substantial evidence test, which we're required to look at. And that says that the state and local government cannot regulate on the basis of environmental effects of radio frequency admissions, period. So, why is that part of a substantial evidence weighing? Because what the act does, what Congress did in that was simply wall off or fence off an area that's regulated by the FCC. And said, localities, states, you can't go there to the extent that a, a facility would comply with FCC regulations. You can't regulate over top of the FCC. It did not say, however, that if you should do that, if you should stray into that preempted area, for whatever reason, you suddenly forfeit your traditional zoning authority, which we've said is preserved except for these specific limitations. I think you're probably right as a general proposition that we can still look at the other provisions, and it may relate to remedy. That's the way the district court handled it. In other words, having said you regulated improperly on the basis of RF impact. One approach would be to send it back and let you consider it without that. But the district court also found it troubling that there would be, must be a rationalization because there was quite a bit of attention given to the RF. Not only was there attention given to it, the people testified to it. I think about over the period of those various hearings, three or four of the supervisors were concerned about it. And they finally made a motion and put it in there and that was adopted by the motion maker and the seconder and approved explicitly. The district judge was worried that the decision had been made on that basis and therefore trumped any effort for you to do it on the basis of size. And that's the only other ground, the size. I think the proportion of the silo. Because the silo was 125 feet and then it was reduced to 100 feet. That satisfied the commission. And then they later took it down, what, to 90 feet. And so there's a good question in the district court's mind. Maybe that the other objection had been mitigated sufficiently because it had already been approved by the commission and the real reason was the radio frequencies. But I think the Judge Hagee's question really focuses on that. So we'll be looking at the other issue first and the district court. I think the district court ruled your way on the other issue, right? With respect to substantial evidence? Yes. Yes, yes, your honor. And that's one of the chief problems with what the district court did in terms of a remedy. The court had already found that there was substantial evidence in the record to support, irrespective of any concern about RF emissions, to support the board's decision. Having done that, I submit that it was error then for the court to say, I'm not going to send it back. There was no need for the court to send it back to the board. The board had already laid out valid reasons for saying no. And in fact, those were the reasons laid out in the original motion. The negative environmental impact reference was, as you know, a friendly amendment, notoriously friendly amendment. Mr. Adamson, if you have two reasons why you're rejecting an application, and one of them is illegal, and you take that away, you can send it back to say, well, would you really have ruled on the basis of the aesthetics? And the judge considered that, but concluded that in this circumstance, the board would be guided by the improper reason. Some problems with that approach of the district court, however, your honor. There was some basis in the record for him to think that, since the supervisor who added this radio frequency part to the motion was pretty frank. He won a court test, and he said, we do this all the time. We make these sub rows of decisions, and I'm just going to put it out here in the public. That's one way to look at it. On the other hand, I think there's a viable argument to say that if we take the radio frequency emission as simply part of the substantial evidence test, that you're in effect writing this separate section of the statute out. It's just one factor among others, and if that were the case, why would Congress have put it in a separate section? Well, one can always ask why Congress writes things in particular ways, but. Well, doesn't it get to the problem, really, with this? I mean, it's, I understand your argument that you just factor this in and you try to separate these things out, but that's pretty difficult. And I don't know any circuit court that has adopted that. It's almost like we're adopting some sort of a, we went down your road, some sort of a comparative negligence test. We're going to assign percentages to these factors, and if we can somehow define that the radio frequency part was 10%, well, then substantial evidence was the other 90%. I mean, how do you draw that line? How do you make that, how do you do that test? It's easier in this case, and now, Your Honor, I would correct one thing. The Second Circuit did adopt that specific test. It viewed the RF claim in the context of a substantial evidence issue. It looked to see whether there was substantial evidence of other valid reasons for the denial, even though safety issues had been cited, and proxy for health issues had been cited. If you did it that way, then Congress's command would never be honored. It would always just be subsidiary point. Well, here, Your Honors, the, and I want to move on quickly to effective prohibition, but just briefly. The motion to add negative environmental impact was added as a fourth reason for denying the special exception. There was a completely legally distinct requirement for a commission permit, a state mandated review with respect to whether this proposed facility was in substantial conformance with the comprehensive plan, completely apart from the special exception considerations. And what the board found there, and there's ample basis in the record for this as the district court found, that under the comprehensive plan, there is a preference, as there is in many localities, a preference for locating these facilities on existing structures. There, as it turns out, there were existing structures which T-Mobile had written off years before and never revisited, the Simpson Farm silos. The board found that those were available. And under the commission permit requirements, could not issue the commission permit, irrespective of any concern about RF. Where this is going, and even, and this is the argument, it seems like to me you're touching on, is we're talking about the Steven silo here. Yes. And that is, as Judge Agius pointed out, I mean, it is pretty clear what's going on here. I mean, the commission has stated, and then one tried to clean it up a little bit. And I'm not so sure if there are some other valid reasons that wouldn't be a substantial basis. But what I'm more focused on here is the fact there are two different, there is the commission permit and the special permit. And they are required by different authorities, and they do come from different ways. And in this instance, they, in fact, did give different reasons for each one. And with the commission permit, it's not in there. Special one is there. It is about the RF emissions, the whole bit. And that seems to, I mean, that's, I'm not sure that issue's been addressed by us or because, I mean, it's improper in one, but nonetheless, the other one is still valid. You don't go with it. So, I mean, that's kind of the interesting twist on this issue here. It seems like to me you might have hit on something. We certainly hope so, Your Honor. All right. If there's no more questions, I'll sit down. You've got some more rebuttal. Yes. Let's hear from Mr. Thompson. May it please the Court, Scott Thompson on behalf of T-Mobile. Since I'm in the unique situation of being both the appellee as to the RF claim on the Simpson silo and the cross-appellant, I'm going to have to try to address a lot at the same time. Let me quickly address the... So why does the radio frequency issue give you an override while you build your tower? As we pointed out and as the District Court correctly found, it is a separate claim under the Act. Congress specifically said that they do not want local governments denying permits either directly or indirectly based on radio frequency. I want to clarify that... So if the one supervisor kept his mouth shut, you'd lose? Well, no. In fact, and because I've got multiple claims here, I'm going to go ahead and jump and point out that we believe that the Court was incorrect in finding that there was substantial evidence. A silo is a permitted by-right use... Right. I understand that part, but your position is, at least as far as the silo, I think you've got a pretty tough uphill battle on the bell tower part for radio frequency, but as far as the silo is concerned, your position is they use radio frequency as a reason to deny it. End of case. Correct, Your Honor. Otherwise you lead to exactly what Supervisor Miller pointed out. They keep their mouth shut and as he said, they lie about the reasons and they put down reasons that they believe would otherwise be valid. In this case, those other reasons cannot be valid because they claim that a silo would not be aesthetically compatible, yet a silo absent the antennas, and in this case those antennas are completely invisible, they're hidden inside, a silo of this height would be permitted by-right on this location. So the aesthetics of that silo... When you say it's a, you mean there's no zoning or anything that would include a 90-foot silo? Correct. It's an administrative process. All they have to demonstrate is that the setbacks are met, and there's no real question here that they would be satisfied in this case. And in fact... Would you think the county would contest it if you wanted to build a silo that wasn't for agricultural purposes? They may, but the visual appearance of it, again, can't be the legitimate grounds for the, because the appearance of a silo has already been determined to be the type of thing that you're going to see on a farm in this area. So we believe that- It's not an ordinary silo, though. How tall is this thing? This one, the ultimate proposal was for 90 feet, although T-Mobile said that it would consider 80, but the board decided before that. Is the silo in that county that high, is it? Yes, Your Honor, there is. The evidence shows that there are some higher than that, in fact. But the point is, under the zoning code, they are permitted by right with no limitation on height. So the fact- You know, in the Middle Ages in Italy, the merchants used to build towers in the towns, and the height of the tower measured the wealth of the merchant, and so they all tried to build taller towers. So I guess in Loudoun County, the farmers who have the tall silos are the wealthy ones. I'm not certain about that, Your Honor. I would like to point out, very quickly, the Oyster Bay case in the Second Circuit did not have an explicit RF claim in that case. In other words, the claim that they were addressing was brought strictly under Subsection 3, which is the substantial evidence. There was no claim separately that it was a violation of Subsection 4. So the board- The members of that town's governing board had better legal advice in advance, apparently. Maybe, but so as a result, the Second Circuit- Let me move on to our cross-appeal issue. The 1996 Telecommunications Act was enacted to bring about competition in advanced telecommunication services for consumers. At this point, 30 percent of people have no traditional wired phone in their homes. They use wireless phones. Fifty percent of people use their wireless phone in their home, even as their primary communications device, even if they have a traditional landline phone. And 70 percent of E911 calls are made from wireless phones. One of the primary questions in this case is whether T-Mobile has a right under the Act to design and deploy its network in such a way to be able to offer service and provide service to people in their homes where they want to use this service. The district court- According to whose standard? The standard is, under the Act, the standard simply says, prohibit or have the effect of prohibiting. What I think Your Honor is getting to is a couple of mistakes that we believe the district court made. The district court, for example, pointed out, well, this is a standard- The standard- Let me back up. There are two different issues here. One is the signal strength. What signal strength is necessary to be able to provide service within the home? There's ultimately no dispute here between our expert and the Board's expert about what that signal strength is and that T-Mobile doesn't have it. T-Mobile doesn't have sufficient signal strength in this area that has about 10,500 people in it to provide service within homes. The other- No, that's not true. They've got- They can provide service in the homes. It was a battle of statistics, if I remember the record. You got up to whether there was a 2% call failure rate or a 1% drop call rate. It wasn't that there wasn't any service. In fact, it looked like that you had 97% minimum service. No, Your Honor, I'm sorry, but you've confused several things. T-Mobile's standard that it seeks to have 95% of the area have this signal strength. It doesn't claim 100%. The 97% that Your Honor is thinking about is that our expert testified that public safety networks are designed to reach 97% of the covered area with the minimum signal strength. The dropped call- You're measuring the minimum signal strength by dropped calls, failed calls. No, that's not entirely accurate, Your Honor. The experts, both ours and the board's, use a process called propagation maps. Those are the maps that create a computer model of the coverage. In our case, our expert also went out and did what's called a drive test, where they physically drive through the area with highly sophisticated equipment that measures the actual signal strength that's present right now. And based on those factors, he found that there is an absence of sufficient signal strength to provide in-building coverage. What you're thinking of is called the dropped call statistics. Those measure the number of dropped calls on surrounding sites. And what Mr. Conroy, T-Mobile's expert, explained was is that is a factor, that is one factor that they look to. And if the dropped calls fall or rise above a certain level, that's an indicator, a factor to him when they're designing a network that says, okay, these surrounding sites are reporting dropped calls from this direction. That tells us that we've got the weak signal happening here. And it corroborates his finding in the drive test and also the propagation mapping. And from that, both he and the board's expert both agree T-Mobile has an area here where it does not have sufficient signal strength to provide in-building service. I think that what you're, what the district court ultimately said was it believed that as long as T-Mobile had sufficient, any signal at all, basically signal sufficient to provide service outside, that that was sufficient and that T-Mobile had no effective prohibition claim at that point. Don't you also have to refute as to whether there's some reasonable alternative sites? We do, Your Honor. And in this case, we did. Did the district court also say you didn't do that? The court did. We had an expert who testified that if you use those alternative sites, that would show some improvement. Is that not right? Two points. The court ultimately ruled on the availability of alternatives based on its understanding that T-Mobile didn't need those alternatives because the court believed it had service, number one. Number two, there is at a minimum a genuine dispute of fact in this case that should have prevented summary judgment on this count for the board. Because while the board's expert postulated that there were certain alternatives, our expert, Mr. Conroy, testified that their expert's propagation modeling software was inaccurate and was not reliable because it had not been tuned. These models have to be tuned to take into effect the type of particular topography, the type of tree clutter in that area. And he testified her propagation study, upon which she was saying these other alternatives existed, was not reliable. At a minimum, you at that point have a genuine dispute of fact. I saw earlier cases say that it's your burden to show why these other possible sites are identified don't work. And there was at least one on the silo site where there were other silos down the road that apparently T-Mobile chose not to pursue because of a policy reason of foreclosure and that the property came out of foreclosure and that you didn't establish that that was not available. Your Honor, number one, there is no effective prohibition claim on the silo site, only on the bell tower at the church. First of all, second of all, to address that point, because it is part of the substantial evidence argument, the other silos on the Simpson farm, which is next door, were ruled out because they were too short. And under the boards, and also in part because we couldn't ultimately reach the landlord, but because they're too short, they would need to be increased in height in order to make them tall enough to provide the service. Under the county's code, once you increase the height of that silo, it's no longer an existing facility. It's a new facility. It would be treated the same way as what we're proposing on the, God, I'm blanking on the – Stevens. Stevens. Thank you. Sorry. On the – Stevens. So that's why those were ruled out. They were too short. Increasing their height would then turn them into a new structure that would be no different than what we're proposing. But back to the – Well, as you said, you had, as of right, you could build a silo. We believe you can. But we ultimately – So you couldn't, as of right, jack up the height of the silo on the other farm? You could, except that at the time, they couldn't ever get in touch with the landlord because it was in foreclosure. And so they went ahead with the property next door. So again, so we believe that that's part of the – Let me ask you about the bell tower site. You say that the service the court heard in ruling on the – or the board on the lack of service issue. What if you're right on that? Isn't there an aesthetic issue they relied on, too? So that, Your Honor, would go to the substantial evidence claim. Right. I would argue that, again, this is like the silo. And in fact, this is an important point because it goes to showing that we have no – it would be fruitless to use the court's terms to pursue further alternatives in this area. The board and the citizens, as to the bell tower, overwhelmingly were opposed to wireless in this area at all. The T-Mobile's proposed site on this church is in a unique little district. It's called CR1. And that is the only – and it is surrounded by zones that are zoned more restrictively, residential or PDH, planned development housing. Within a CR1 zone, a new standalone wireless structure is permitted if you get the permits. In the surrounding zones, they're not permitted at all. The overwhelming evidence here was that people were opposed to wireless in this area at all. Again, this was going to be – What was the reason given by the board? They overturned the commission, didn't they? The board overturned the commission, and let me – so let me address that. This gets to your aesthetic point. They took the position that this was going to be inconsistent with the area. But this is a bell tower at a church, which, again, without the antennas, would be permitted. I understand, but I just need to know – I'm trying to figure out the problem that you created with these separate counts. The question is, if you lose on the strength of service issue, don't they still have a right to bar this based on their aesthetic concerns? So there are different counts. So if we lose on the effective prohibition claim, then the court can still rule for us on a substantial evidence claim. It's our position that the court erroneously found that the aesthetic support was substantial evidence. It's our position that under the act – Isn't that the reason the board gave? The board did – Out of proportion, it was disproportionate? Correct. My – our point is – And that was affirmed by the court saying that there was evidence to support the board's conclusion. Correct. And the citizens testified to that effect, and they were upset by the proportionality. Now, the question is, is that a legitimate reason to reject the tower? No. Standing alone? No. Because it's – it cannot be legitimate in this instance because a bell tower of this height – there's some dispute about if they – it may have to be 74 feet. I understand a bell tower could be authorized by the church and was authorized. But that doesn't follow. That logic doesn't work because the citizens may be opposed to the church doing it, too. But they – The church had a legal right to do it. The telephone company did not have a right to do it. So they exercised – they said our aesthetic objections with this tower are based on our ability to make that objection. On the church, if it's a church steeple, they couldn't do it. What this comes down to, Your Honor, is that the aesthetic objection is not substantial evidence for purposes of Section 332 because the board, in other instances, has said that this same structure would be aesthetically consistent with this location. The other – the other circuits – They just approved it. We don't know why it's approved. The church has a right to a 74-foot steeple. That's in the code. Okay. It's a legislative point that the county has legislatively found that this type of structure – I know, but that doesn't determine the aesthetic. The church, first of all, never exercised it and maybe chose not to for this reason. They had that choice. But they're now faced with a tower to which they can raise an objection. And they don't like a 74-foot tower, they don't like an 80-foot tower, and they didn't like an – I don't know how tall your tower was. 80-foot, wasn't it? It was 80-foot, Your Honor. Yes. So they didn't like an 80-foot tower there and objected on that basis and the board gave that as a reason that it would rise above the residential area and be disproportionate. And our point is that it's clear from the actual evidence that the court needs to look past the stated reason to the actual evidence and say, is that stated reason supported by substantial evidence? And the other circuits have made clear, this needs to be evidence that's substantiated. We simply can't defer to whatever the board says. The purpose of the act was to prevent parochial – Why do you think the board turned – reversed the commission? The commission approved this bell tower. And why do you think the board turned it down? What was the – what were they acting on? They overwhelmingly stated that they were opposed to any wireless facility in this area. Why? Because they're afraid of – because they're afraid of RF emissions. It's that simple. The overwhelming – again, there was – there's overwhelming evidence here, like in the silo case, that that was the real concern. Yes, people were – people were also concerned – the RF concern. I think that it is a pretext, yes. And I also think that fundamentally people will – people will object to anything, right? If the – if the – They have a right to. I mean, this is their community. But they don't – but, Your Honor, they don't. They don't – they – the other court – the other circuits have made clear, and this is the purpose of the act, is to prevent wireless facilities from being denied based on that kind of just political, parochial objection. There has to be substantial evidence, and that evidence has to be substantiated. It can't be just a generalized, we don't want wireless here. If I go in the record, and I think it's there because I've looked at some of them, if there's testimony by citizens who say, I'm just offended to having – this is a residential area and all the rooftops are basically low, it's farmland-type area. I object to having a bell tower rising 80 feet above that. And that's sufficient. Yeah. That's my question. Because the board has legislated – in Loudoun County, the county has legislatively found that such a structure, a bell tower at a church, is otherwise consistent with the church in that area. That doesn't address the question of whether they are opposing a bell tower for aesthetic reasons. The fact that there's a – the church can build a steeple or a bell tower as part of the church is a decision made that's not before us. We don't have any testimony on why that was allowed. But the citizens clearly objected to the proportionality of a bell tower there. The point is that the aesthetics of the bell tower would not be in play but for the antennas that are hidden within it, and therefore the RF emissions. And I see my time is over for this point. But it could be in play because they had a right to object on aesthetic grounds. They do not have a right to object to the churches doing it on aesthetic grounds, even though they may have had aesthetic objections. But they do have a right to object on aesthetic grounds to the tower used as a – and that doesn't mean they're objecting to the RF. That means they don't like the proportionality. Now, they may have made a mistake on the earlier thing, but that doesn't, as a matter of law, require – make the reason phony as to why they're opposing this structure. Well, I guess the – I didn't follow that argument in your brief. And if that's the only one – I mean, my question is how can we – if they have testimony from citizens that is genuinely concerned about the aesthetics and the board agrees with that, is that a sufficient reason for them to turn down the tower at this location? Your Honor, if there is substantial evidence in form of testimony opposing the aesthetics of the specific site, that would – that would mean that our claim under subsection three fails. Nonetheless, our claim under the effect of prohibition would overrule that if you were to rule in our favor. In other words, the act is structured such that – and this has happened in many other cases that we've pointed out in other circuits. There may be substantial evidence that allows them to deny under a particular local reason. But nonetheless, the court then has to say, okay, does this nonetheless have the effect of prohibiting service? Because Congress wanted – If we conclude it does have the effect of prohibiting service, does the board then get an opportunity to select another site where the same service would be provided? No. In this case, they haven't identified one that would. Well, I understand. But I'm trying to figure – this is an interplay between the national interest in having cell phone coverage and the local interest in protecting the community. And Congress has tried to have this interplay. And you're saying that if the court erred on this insufficient service ruling, and you're right on that, then the tower has to be allowed, despite the evidence objecting to aesthetics? Correct. And other courts have ruled that. That's the – the remedy would be an injunction granting – requiring them to grant the location. Okay.  Sorry, Your Honor. That's my question. All right. Mr. Stoner? Mr. Stoner, before you get started, there's something that – underlying issue that has troubled me in this case. In each case, a commission approved these stealth towers, so to speak, and reviewed the applications in detail, required changes. Changes were made to style, painting, size. A lot of effort by T-Mobile to work with the county, and the commissions were expert, and the board comes and reverses them both times. How do we take that? Well, first, it's the nature of the beast, Your Honor. The board is the legislative body. It's not bound by what the planning commission has said. Of course not. They have the power to overrule it. But the question is, the expert people who are reviewing are on all fronts, architecturally and everything else, aesthetics, everything. They addressed aesthetics. They addressed all these things. They got adjustments, and they asked a lot of questions, and they approved it. And now the board comes along and has a hearing or two, and people pop up, and most of them are talking about cancer, and they're worried about cancer. I don't want cancer in my house, and I don't want this running through here, and I don't want to go to church past this, which is number one, preempted, and number two, pretty nonsensical based on the data. Apparently, it's what a cell phone is 1,000 times more powerful than a tower in terms of effect. But set that aside, my question is, is that something we can consider in the overall determination as to whether there's substantial evidence to support the board's action? Ultimately, I think no, Your Honor. In both instances, staff recognized that there were problems with the applications. Ultimately, in both instances, staff recommended approval, but not without reservations. For example, with respect to... What was the approval? One was seven to one to one? That was on the Stephen Silas Ethical Planning Commission, five to four, and the Planning Commission chairman sent a letter explaining that the Planning Commission had been operating under the assumption that the church could build a by-right 74-foot bell tower, real bell tower, in the same location. That was simply untrue, as we've pointed out in the briefs, for a variety of reasons. Number one, the church itself has an existing special exception covering the entirety of That special exception would have to be amended for the church to put a bell tower. A bell tower was not approved as part of the church's special exception, so that would have to be done. Second, the proposed bell tower facility was on a separate... What was the authority for a 74-foot tower? That's the setback. It has to be... The structure would have to be set back one foot for... The height would have to be one foot for every foot of distance from the property line, so one for one. 74 feet. 74-foot height, 74 feet from the property line. In fact, it's only less than 59 feet from the eastern property line. But the church couldn't build an actual bell tower, even setting aside its own special exception hurdle, couldn't build an actual bell tower in the proposed location because it's on a separate lot from the church building. Accessory use, such as a bell tower, has to be on the same lot as the principal use, again as we've pointed out, another reason why the Planning Commission was laboring under a false assumption. And so, for a variety of reasons, neither an identical tower nor a similar tower could be built in the location proposed by T-Mobile without a lot of other hurdles being crossed. With respect to the Stephen Silo site, as the Court pointed out, what was proposed by T-Mobile was not a silo, not an authentic agricultural silo, which, by its very nature... No, but it addresses any aesthetic concern. In other words, if the whole reason is aesthetic, and silos are permitted, it seems to me that's a funny reason. It's a... The question, and apparently silos are permitted there, right? Agricultural silos are permitted, by right. Well, if there's hay inside, it's okay, or grain inside, it's okay, but if there's antenna inside, it's illegal. Well, not... I mean, aesthetically. Yes, it requires a special exception. No, not illegal. Aesthetically. It requires a commission permit, which... I understand, but as an issue of aesthetics, that doesn't hold water. It does, Your Honor, for this reason, and this was explained by one of the witnesses before the Planning Commission and the Board. I'd say my time is out if I may respond. Go ahead, sure. As was explained, there's a rationale for allowing agricultural, authentic agricultural silos, by right, without a height permit, height limitation, because the height limit will be driven by agricultural concerns. There is no evidence of a farmer going out and building a 500-foot tall silo in Loudoun County, a 200-foot tall silo in Loudoun County. In fact, in the area around the Stevens silo site, they're 35, 40, at most 50 feet high. So what was proposed was two to three times the height of existing authentic silos in the vicinity. I thought it was a 90-foot silo. It was a 90-foot silo. But under T-Mobile's rationale, it could build a 500-foot tall silo. Look, let's not go to hypotheticals. There was an aesthetic objection to the 90-foot silo. That was the reason given. And my point is, if grain were allowed to be in that silo and it could be built, and you concede it could be, it's aesthetically different than a silo with a tower in it. And I don't follow that. Well, as was explained also to the Planning Commission and the Board, an authentic silo will not be standing alone. It would be accompanied by a cluster of farm buildings, which would be to scale with the silo. With a telecommunications silo, such as T-Mobile proposed, it's standing there stark. Nothing else to balance it out. I didn't hear that objection being made. I heard the objection about equipment being covered, and they were going to use a barn for that. And apparently T-Mobile even agreed to that. But I didn't see any of the testimony said. The testimony was hype on the aesthetics. But I think I must say there was a lot of testimony on cancer. I would dispute that, Your Honor. Well, I went through and marked, and there were discussions by at least four supervisors about it during their concern. But remember that the Act does not prohibit concern about RF emissions in the public proceedings. That's the subject of the hearing the Board is doing. And how about if that were the exclusive subject, and then they come up and give us their reasons of aesthetics, you would have to conclude there wasn't substantial evidence to support the aesthetics because the whole concern was the RF. A court might find pretext there, but that is far from this case. I understand. The bulk of the testimony was about other concerns. And in fact, in the final analysis, what the Board asked for in regard to the Stephen Silo site in particular was, show us why we shouldn't be concerned about RF emissions. Because the Act prohibits decisions, regulation based on RF emissions from facilities that would comply with FCC regulations. If a facility wouldn't comply with FCC regulations. It was not compliance. They even put on an expert witness during one of the hearings. Exactly. That's my point, Your Honor. That was at the request of the Board. So, most of the discussion among the Board about that occurred before and in conjunction with that report. After that report was issued, I believe if you'll check the transcript, it's only Supervisor Miller who in the final hearing made his friendly motion. He made an amendment, and the person who made the motion accepted it, so it had to be part of his. And then it was voted on and approved by everybody. But that was against the context of three or four meetings. And those three or four meetings, there was a lot of discussion on that subject, and there was testimony of the expert. Anyway, thank you. I do believe you get some rebuttal. Is that it, how we set this up? Thank you, Your Honor. Before you begin, I meant to ask a question regarding count five that I'd asked earlier and it concerned the alternative argument that even if this RF permissions wasn't permissibly used, it was the basis for the special exception, not the commission permit. And although the District Court says it's one decision, it really is, there really are permits from different authorities and arise in different situations. How do you respond to that? Yes, Your Honor. Thank you, actually, for bringing that up. There are two things. First, as a matter of fact, in this case, the board treated both the commission permit and the special exception application as a single proceeding. If you were to look at all the notices, all the decisions, they all listed as one. Second, if you look at the transcript of the motion, the motion says that it is a motion to deny both the special exception application and the commission permit. It's a single motion covering both. The commissioner does, I'm sorry, the supervisor does at times mention special exception as opposed to the other, but the reality is there was one motion for both. Did they have separate reasons, though? They did not. If you read closely, it's kind of strange. She says it's a single motion to deny both, then says at one point, reason one, special exception, but then says number two and doesn't differentiate them and number three doesn't differentiate them. The reality is it was a single motion covering both applications that was voted on just once. The motion was voted on just a single time. Interestingly, if you look at the bell tower proceeding, they had two separate motions, but as to the silo, it was all treated as a single, and that's what the district court found, and I think that was correct. The other thing I would say, though, is even if you were to separate them out and even if RF were only reason for one, as a practical matter, that still leads to denial of the application, right, because T-Mobile needs to have both of those granted. So if you deny one, it still denies the silo, and you still get to the analysis under it. The other point that I wanted to make here is I think that Judge Niemeyer has made an important point, which is in the substantial evidence analysis, the courts have made clear that you have to consider the record as a whole, and here you have a situation where T-Mobile went through, really it was a multiyear-long process of working with the staff who are in the planning commission who under the county's code are described as being their experts on planning, multiple stages, multiple changes to try to mitigate the effects, and when those staff experts and the planning commission are satisfied, that is evidence that in fact the proposal is consistent with the appearance, the aesthetics, and the uses in the area, and that the appearance has been mitigated. The court has to consider that as part of the substantial evidence analysis, and so I think it is important. I think that... So what do we look at? We look at that, what the documents are put in, and we look at the testimony given to the board? Yes, Your Honor. You look at the record as a whole, and you have to consider the analysis of these, like I said, the county code sets the planning commissioner up as being the county's expert on planning. You have to consider that rational, developed decision by the staff and the planning commission compared to the, let's face it, they were parochial concerns of local residents, you know, they were trotting out their children saying, please don't put this up, I don't And it's our position that the substantial evidence is not supported by the generalized objection to wireless that was revealed in the testimony of those citizens. So those were the points I wanted to make on rebuttal, unless there were anything else? All right, thank you very much. Thank you, Your Honor. We'll come down and agree counsel, and go right on to the last case.
judges: Paul V. Niemeyer, G. Steven Agee, James A. Wynn, Jr.